IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER ELEVEN |
| | : | |
| MACHNE MENACHEM, INC. | : | BANKRUPTCY NO.: 5-01-bk-04926 |
| | : | |
| Debtor-in-Possession | : | {**Nature of Proceeding:** Confirmation of |
| | : | Modified Second Amended Plan Filed by |
| | : | Yaakov Spritzer} |

# **OPINION**

Before the Court is Yaakov Spritzer's[1] Second Amended Plan which has been subsequently modified. The Debtor-in-Possession[2] has raised four primary objections to the plan including nonconformance with: 1) 11 U.S.C. § 1129(a)(16) by violating applicable New York non-profit law; 2) 11 U.S.C. § 1129(a)(3) because it was not proposed in good faith; 3) 11 U.S.C. § 1129(a)(3) because confirmation would ignore and violate New York non-profit law; and 4) 11 U.S.C. § 1129(a)(11) claiming the plan is not feasible. See Doc. No. 475. For the following reasons, the Court will overrule the Debtor's objections and confirm the plan contingent on Spritzer meeting certain conditions further elucidated below.

**1.) Does the Plan Violate 11 U.S.C. §1129(a)(16)?**

Section 1129(a)(16) reads in pertinent part:

> All transfers of property of the plan shall be made in accordance with any
> applicable provisions of nonbankruptcy law that govern the transfer of property
> by a corporation or trust that is not a moneyed, business, or commercial

---

[1] Yaakov Sprtizer was one of the original Board of Directors who, after an arduous legal battle in the United States District Court for the Eastern District of New York, was removed from the Board of Directors, but not before putting the corporation into Chapter 11 bankruptcy on December 6, 2001. For a detailed discussion of the parties legal history, see *Machne Menachem, Inc. v. Hershkop*, 2003 WL 1193528(W.D.N.Y. January 31, 2003); *Machne Menachem, Inc. v. Hershkop*, 237 F.Supp.2d 229 (E.D.N.Y 2002); *Machne Menachem, Inc. v. Hershkop*, 1999 WL438471 (E.D.N.Y. May 12 1999); and *Machne Menachem, Inc.v. Hershkop*, 1998 WL 564541 (E.D.N.Y.. July 17, 1998).

[2] Debtor is Machne Menachem, Inc., a non-profit corporation formed and governed under the laws of New York. Debtor owns and operates a religious summer camp, located in Lackawaxen, Pike County, Pennsylvania, for Hasidic Jewish male children. For a more detailed discussion of the formation and earlier tribulations of this case, see the Court's former Opinion at *In re Machne Menachem,* 304 B.R. 140 (Bankr. M.D.Pa. 2003).

corporation or trust.
11 U.S.C. 1129(a)(16)[3]

The sections of the New York Not-for-Profit Corporation Law (N-PCL) at issue in this case are § 509 and § 510. N-PCL §§ 509, 510 (McKinney's 005).

Section 509 reads:

> Purchase, Sale, Mortgage and Lease of Real Property. No Purchase of real property shall be made by a corporation and no corporation shall sell, mortgage or lease real property unless authorized by the vote of two-thirds of the entire board, provided that if there are 21 or more directors, a vote of the majority of the entire board shall be sufficient.

N-PCL § 509 (McKinney's 2005)

The pertinent parts of Section 510 of New York Not-for Profit Law is as follows:

> Disposition of all or substantially all assets. (a) A sale, lease, exchange or other disposition of all, or substantially all, the assets of a corporation may be made upon such terms and conditions and for such consideration which may consist in whole or in part of cash or other property, real or personal, including shares, bonds or other securities of any other domestic or foreign corporation or corporations of any type or kind, as may be authorized in accordance with the following procedure:
>
> (2) If there are no members entitled to vote thereon, such sale, lease, exchange or other disposition shall be authorized by a vote of at least two-thirds of the entire board; (3) if the corporation is, or would be if formed under this chapter, classified as a Type B or Type C corporation under § 201 (purposes), such sale, lease exchange or other disposition shall in addition require leave of the Supreme Court in the judicial district or of the county court of the county in which the corporation has its office or principal place of carrying out the purposes for which it was formed.[4]

N-PCL § 510 (McKinney's 2005)

Debtor is a Type B not-for-profit corporation under New York law. Debtor contends that, as a Type B corporation, it cannot have its assets sold, transferred, or "otherwise disposed of" without either the two-thirds vote of the Board of Directors, or leave of the appropriate state

---

[3] This Section was added to the Code through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA") and is applicable to cases which were pending on the date of the enactment. HR Rep. No. 31, 109th Cong., 1st Sess 1221 (2005).

[4] Section 201 of the Not-for-Profit Corporation Law defines a Type B as a not-for-profit corporation for charitable, educational, religious, scientific, literary, cultural or for the prevention of cruelty to children or animals.

court.

Spritzer argues that the aforementioned New York Not-for-Profit §§ 509 and 510 only apply to *voluntary* transfers by the company. He advances that nothing in New York Not-for-Profit Law precludes a creditor from seeking to sell the assets of a not-for-profit pursuant to a plan of reorganization proposed by a creditor (an involuntary transaction). As a parallel example, he cites the situation where a not-for-profit's assets can be sold without a vote at a foreclosure sale.[5] According to Spritzer's logic, the transfer of corporate assets pursuant to a creditor's plan of reorganization would be an involuntary transfer of assets, similar to a foreclosure, and not governed by either N-PCL § 509 or § 510. Since Spritzer's plan calls for an involuntary transfer of corporate property, no vote of members would be necessary and his plan would not be contrary to New York Not-for-Profit Law.

Ultimately, the issue boils down to whether Spritzer's plan proposes a transfer governed by N-PCL §§ 509 and 510. This issue requires the determination of two things; first, is Spritzer's transfer voluntary or involuntary; and second, if it is an involuntary transfer, does § 509 and § 510 apply to involuntary transfers.

### A) Does the plan contemplate an involuntary transfer?

The pertinent plan provisions at issue are as follows:

> **5.3** <u>Sale of Debtor's Property.</u> The Bankruptcy Court's entry of the Confirmation Order shall constitute approval of the sale and transfer to New Entity on the Confirmation Date of all of the Debtor's right, title, and interest in and to the

---

[5] It should be noted that the cases cited by Spritzer do not support his contention that foreclosure sales of non-profit property do not require majority votes and cite as authority for this proposition the case of *Adult Home at Erie Station, Inc. v. Assessor and Board of Assessment Review of the City of Middletown,* 801 N.Y.S.2d 776, 2005 WL 1552847 at *1 (NY Sup. Ct. July 1, 2005). However, that case has nothing to do with the instant quandary and centers around whether a not-for-profit adult home qualified for a tax exemption. The only connection between this case and the case cited is that *Adult Home at Erie Station, Inc.,* involved a not-for-profit corporation purchasing a home at a foreclosure sale. There is no mention in the case that a not-for-profit corporation was the owner of the property prior to the foreclosure. At issue here is not whether a not-for-profit corporation can buy property, but rather what the appropriate corporate procedure is when a not-for-profit corporation's property is being involuntarily transferred. The second case they reference, *Tenants for Justice v. Hills*, 413 F. Supp. 389, 390 (E.D. Pa. 1975), involves a home which originally belonged to a not-for-profit corporation which was foreclosed upon, it does not discuss the circumstances of the foreclosure and whether there was a vote prior to the involuntary transfer of that property.

[m:\u\c\o\...\5-01-bk-04926_Machne_Menachem_Plan.wpd]    -3-

Case 5:01-bk-04926-JJT    Doc 594    Filed 09/06/06    Entered 09/06/06 15:37:53    Desc
Main Document    Page 3 of 11

> Debtor's (and its estate's) personal property (tangible and intangible, including all claims and causes of action) and real property (including real estate, improvements thereon, and fixtures).
>
> (a) <u>Execution of Documents.</u> Pursuant to Section 1142 of the Bankruptcy Code, the Debtor is directed, within two business days after the Confirmation Date, to execute a Bill of Sale, transfer of Certificates of Title, and a Quitclaim Deed in favor of New Entity. If the Debtor fails or refuses to execute the Bill of Sale, transfer of Certificates of Title, Deed after the Confirmation Date, the Proponent is authorized and empowered, without further court order, to execute such documents on behalf of the Debtor and to execute all instruments and to do all acts and things with respect to the purchased assets which New Entity shall deem necessary or desirable to more effectively convey or transfer to, and vest in, New Entity the purchased assets.

Using the text to determine the economic reality of the transaction, this is not a voluntary transfer of Debtor's assets. Carrying out this provision of the plan would require the current board of directors to sign over the Debtor's property to this new entity, and as evidenced by the tangled history of litigation between the parties, that will be an involuntary action on the part of the current directors.

**B) Is an Involuntary Transfer Within the Gambit of N-PCL §§ 509, 510?**

Having established that the plan contemplates an involuntary transfer of the Debtor's assets to a new corporation, the issue becomes whether N-PCL § 509 and § 510 prohibit an involuntary transfer of Debtor's assets. The statutory language of N-PCL § 510(a) states the section applies to "a sale, lease, exchange or other disposition of all or substantially all, of the assets of a corporation . . . ." This Court has found no New York authority regarding whether an involuntary transfer pursuant to a bankruptcy plan falls within the language "other disposition."

One way to interpret the law is to read the phrase "other disposition" as encompassing involuntary transfers of corporate property. To read the statute in such a manner would lead to an absurd result. If the court were to find involuntary transfers of property were governed by the procedures as set forth in N-PCL § 509 and § 510, that would mean creditors could not foreclose on a not-for-profit's property without a two-thirds majority vote from the board of directors first.

Logically speaking, it would be inapposite for a board of directors to vote in favor of a bank foreclosing on corporate property. This is especially true when the result of a two-thirds vote not to let the creditor foreclose would preclude that creditor from foreclosing. It is this Court's position that if New York's highest court were presented with this quandary, they would agree with this interpretation of N-PCL. §§ 509 and 510.[6]

In sum, because Spritzer's plan contemplates an involuntary transfer of corporate assets, and this involuntary transfer need not comply with either the provisions of N-PCL § 509 nor § 510, the Court finds the plan not in contravention of New York Not-for-Profit Law.

**2.) Does the Plan Violate § 1129(a)(3) Good Faith Requirement?**

Section 1129(a)(3) requires the bankruptcy court to find that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The code does not define the term "good faith" but the Third Circuit has found that "for purposes of determining good faith under section 1129(a)(3) the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the bankruptcy code." *In re Combustion Engineering, Inc.,* 391 F.3d 190, 247 (3d. Cir. 2004) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d. Cir. 2000) (citing *In re Abbotts Diaries of Pa., Inc.,* 788 F.2d 143, 150 n.5 (3d. Cir. 1986)). "A good faith determination must be a fact-intensive, case-by-case inquiry." *In re PPI Enterprises (U.S.), Inc.* 324 F.3d 197, 211 (3d Cir. 2003).

    **A) Bad Faith to Use Bankruptcy as an End-Round of Other Judicial Proceedings**

Debtor argues that this Court may consider a *debtor's* [7] pre-filing conduct, as well as the

---

[6] "Where a state's highest court has not squarely addressed an issue, we must be governed by a prediction of how the state's highest court would decide were it confronted with the problem." *Cooper Distributing Co., Inc. v. Armana Refrigeration, Inc.,* 63 F.3d 262, 275 (3d Cir 1995), citing *McKenna v. Ortho Pharmaceutical Corp.,* 662 F.2d 657, 661 (3d Cir.), *cert denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980).

[7] The term debtor is demarcated in this case because of the atypical circumstances herein whereby the pre-petition Debtor was controlled by the proponent, and the post-petition Debtor has been controlled by a different set of individuals. The Debtor asks the Court to look at the proponent's conduct while he was in control of the Debtor

[m:\u\c\o\...\5-01-bk-04926_Machne_Menachem_Plan.wpd] -5-

Case 5:01-bk-04926-JJT    Doc 594    Filed 09/06/06    Entered 09/06/06 15:37:53    Desc
Main Document    Page 5 of 11

feasability of the plan itself in the context of a § 1129(a)(3) determination and cites as authority for this proposition, *In re Madison Hotel Associates,* 29 B.R. 1003, 1009 (W.D. Wis. 1983). Unfortunately, *Madison Hotel* was appealed to the Seventh Circuit, which chastised the district court on this exact point, holding the district court erroneously construed the § 1129(a)(3) good faith requirement for proposing a plan to be equivalent to the good faith that is a prerequisite to filing a chapter 11. *In re Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir. 1984). The Seventh Circuit continued to find that the immediate circumstances surrounding the plan should be the court's guiding light. See *Id.* Other courts have since agreed, holding that "[t]he evaluation of good faith is not based on the plan proponents' behavior prior to the filing of the bankruptcy petition . . . but instead, in light of the totality of the circumstances surrounding confirmation." (internal quotation marks omitted) *In re Cellular Information Systems, Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (citing *In re General Homes Corp.,* 134 853, 862 (Bankr.S.D.Tex. 1991) and *In re Jandous Elec. Constr. Corp.*, 115 B.R. 46, 52 (Bankr.S.D.N.Y. 1990)). Although this Court is well aware of the scathing opinion by Judge Glasser[8] concerning Sprtizer's pre-petition corporate law violations, that conduct may not be a factor in determining whether this plan is proposed in good faith. Again, the good faith requirement of a § 1129(a)(3) inquiry pivots on the plan itself. *In re Combustion Engineering, Inc.,* 391 F.3d 190 at 247 [citing *In re PWS Holding Corp.*, 228 F.3d 224 at 242 (citing *In re Abbotts Diaries of Pa., Inc.,* 788 F.2d 143 n.5)].

Looking primarily at the parameters of Spritzer's plan, does the plan itself achieve a result consistent with the objectives and purposes of the bankruptcy code? *In re Combustion Engineering, Inc.,* 391 F.3d 190 at 247. Here, Spritzer's objective is to regain control of the camp property and to run the camp as he sees fit, something he would likely be unable to do

---

pre-petition.

[8] *Machne Menachem, Inc. v. Hershkop,* 2003 WL 438471 (W.D.N.Y. January 31, 2003).

without help from the bankruptcy code. That being said, "Courts have construed section 1129(a)(3) broadly, and have generally rejected allegations that good faith is lacking when the debtor's purpose in filing a chapter 11 case is to obtain a benefit or result inside of bankruptcy not contemplated outside of bankruptcy." *Collier on Bankruptcy* ¶ 1129.03[3][a], [citing *Platinum Capital v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1076 (9th Cir. 2002), *cert. denied* 538 U.S. 1035, 123 S.Ct. 2097, 155 L.Ed. 2d 1065 (2003), and *Slow v. PPI Enterprises (U.S.) (In re PPI Enterprises (U.S.))*, 324 F.3d 197, 211 (3d Cir. 2003)]. Using similar reasoning, it would seem that if a debtor could file a bankruptcy with the intention of using the unique laws of bankruptcy to achieve something the debtor otherwise would not be able to do, then a creditor could likewise take advantage of bankruptcy laws to achieve something he would not necessarily be able to achieve outside the context of bankruptcy. Pursuant to that reasoning, the Court finds the sole fact that Spritzer would not be able to achieve this result outside the context of bankruptcy does not *per se* make his plan a bad faith plan, so long as it is not inconsistent with the bankruptcy code.

**B) Bad Faith for Creditor to Absolve Himself from Future Liability to Debtor via a Bankruptcy Plan Which Absorbs All Claims of Debtor**

Debtor currently has two adversary proceedings pending in this Court against Spritzer. *Machne Menachem Inc. v. Meri Schriber and Yaakov Spritzer (In re Machne Menachem)* 5:03-ap-50211 (Complaint seeking $83,142.50 in damages for civil conversion of corporate assets); and *Machne Menachem, Inc. v. Yaakov Spritzer (In re Machne Menachem),* 5:03-ap-50313 (to avoid a preferential transfer of a one million dollar mortgage). Debtor has also objected to the proof of claims filed by Sprtizer and his related entities. See, e.g., Doc. Nos. 365, 366. As shown above, Section 5.3 of Spritzer's Second Amended Plan includes a transfer of all Debtor's claims and causes of action to the new entity governed by Spritzer. After the Court's comments expressing reservations with regard to this aspect of the plan, which comments were made at the

plan confirmation hearing, Spritzer offered two alternative modifications to his plan to avoid running afoul of the good faith requirement.

### i) Exhibit A: Spritzer's First Alternative to Avoid Bad Faith

In a brief filed after the confirmation hearing, Spritzer offered to modify his plan so he would not acquire the Debtor's bank accounts, claims, or other intangible personal property. (See Doc. 490 at 5, and Exhibit A). Following this idea through, and assuming that the Debtor prevailed on its claims against Spritzer that his one million dollar mortgage on the property is a voidable preference, the result would be a windfall to Summer Recreation (Spritzer's new not-for-profit entity) which is purchasing the property at a valuation offset by the one million dollar Spritzer mortgage. Foreseeing that the Court may be unsatisfied with this amendment, Spritzer also offered a second alternative modification to the plan to account for this possible apple of discord.

### ii) Exhibit C: Spritzer's Second Alternative to Avoid Bad Faith

Alternatively, Spritzer offered to modify the plan, as follows: "if the Debtor were to prosecute and prevail on its objections to the Proponent's (Spritzer) claims . . . then the Debtor would have a claim against Summer Recreation to the extent that the claim objections resulted in there being any "equity" in the property transferred to Summer Recreation." (*Id.* at 6 *see also* Exhibit C[9]). If the Court were to adopt Spritzer's Exhibit C amendments, it would allow for two remaining entities.

Spritzer's new not-for-profit, Summer Recreation, would own all of Debtor's assets except its bank account and its general intangibles. Summer Recreation would have acquired

---

[9] The proposed order advocates adding the following subsection to the plan:
"(b) <u>Valuation and Consideration for the Transfer of Debtor's Property</u>: To the extent, if any, that the Debtor establishes that the value of the Debtor's real and tangible personal property transferred to the New Entity under this Plan, as such value is determined by a final Court order in connection with confirmation of the Plan, is more than the consideration (including, without limitation, the assumption of all Allowed Claims) provided by New Entity in exchange for those assets, the Debtor shall have a claim against the New Entity for such Difference." (Doc. No. 490, Exhibit C, at 5.)

assets that the Court finds are valued at $1,375,250 ($1,225,000 in real estate and $150,250 in personalty). This new entity would also have assumed the Debtor's potential liabilities of approximately $1,931,191.31. In sum, Spritzer's entity would be starting out in the red with an approximate deficit of half a million dollars.

The second entity would be the Debtor which would have accounts, general intangibles, and the right to recover from Summer Recreation the benefit of "the 'equity' in real and tangible personal property transferred to Summer Recreation under the Plan as compared to the actual total of allowed claims paid by the Proponent and/or assumed by Summer Recreation." Doc. No. 490 at 8.

Looking at the plan as modified, the question remains is this plan proposed in good faith? Assuming the plan plays out as projected, Spritzer will assume liability for or pay off all Debtor's current creditors, procure the real estate, and ultimately run a camp for Jewish children, which the parties agree was the original intention of the Debtor. Similarly, the Debtor ends up with all its liability being transferred to a new entity and retaining a potential to recover the fair market value of the property less the mortgages and the allowed claims of creditors. The only party here in danger of sinking into liquidation is Summer Recreation which is starting out its not-for-profit life in debt. This plan appears to be proposed in good faith, but, the issue of feasibility must still be addressed prior to the plan being confirmed.

**3.) Feasibility of the Plan & 11 U.S.C. § 1129(a)(11)**

Debtor asserts the plan is not feasible under 11 U.S.C. § 1129(a)(11) which requires: "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The standards needed to achieve plan feasibility are not rigorous. *In re Mayer Pollock Steel Corporation*, 174 B.R. 414, 421 (Bankr. E.D.Pa. 1994). "The Code does not require the debtor to prove that

[m:\u\c\o\...\5-01-bk-04926_Machne_Menachem_Plan.wpd]                -9-

Case 5:01-bk-04926-JJT    Doc 594    Filed 09/06/06    Entered 09/06/06 15:37:53    Desc
                          Main Document    Page 9 of 11

success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." *In re Prussia Associates*, 322 B.R. 572, 584 (Bankr. E.D.Pa. 2005) [citing 7 Collier on Bankruptcy, ¶ 1129.03 [11] (Matthew Bender 15th Ed. Revised) (footnotes omitted.)]. In most cases, feasibility centers around the continuing viability of the debtor's business.[10] In light of the fact Spritzer's plan leaves the Debtor with no continuing business (only funds and the ability to litigate pending actions), the Court finds the usual feasibility factors inapplicable to the instant case.

The Court has one remaining concern with regard to the confirmation of Spritzer's plan. Assuming arguendo that the Debtor is successful in its objection to the million dollar Spritzer mortgage claim, etc., the fund created by the purchase price should vest in the Debtor to some significant degree. There is no guarantee that Summer Recreation will have the funds to address this issue as provided by the modified plan.

11 U.S.C. § 1129(b)(2)(C)(i) requires that a plan provide that every class of interest, including stockholders, receive the "value of such interest." Admittedly, it is a rare corporate Chapter 11 that has no stockholders, as is the case here. New York Not-for-Profit Law provides that this Debtor can legitimately exist without such stockholders. N-PCL § 501. Notwithstanding the lack of shareholders, the beneficiaries of this corporation, i.e., children and adults learning of the Jewish religion, deserve to share the benefits of the net value of the corporate assets, if any. I specifically find that the lack of shareholders allows me, under the powers provided by 11 U.S.C. § 105(a) to direct the equity in corporate assets back into the Debtor corporation to be disposed of by the directors, in accordance with New York state law.

---

[10] When determining a plan's feasibility the court will look to the following factors: "(1) the adequacy of the debtor's capital structure; (2) earning power of its business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of continuation of the same management; and (6) any [of] the related matters which determine the prospects of a sufficiently successful operations to enable performance of the provisions of the plan." *Id.* (citing *In re Calvanese*, 169 B.R. 104, 109 (Bankr. E.D.Pa. 1994)), *see also* 7 Collier on Bankruptcy, ¶1129.03[11] *supra*.

Accordingly, should the proponent be willing to set aside a fund, or escrow account, in an amount equal to the value of the property transferred then the Court finds the remainder of the plan to be feasible. The Court finds that if either Summer Recreation or Spritzer is willing to escrow the sum of $1,375,200 with the Court, the modified plan can be confirmed as feasible. The proponent is given sixty (60) days to arrange such deposit with the Clerk.[11] Subject to claims litigation, the fund shall be disbursed to allowed claimants in the priority envisioned by the plan, with the balance, if any, paid over to the Debtor.

The Court directs the proponent to submit a proposed order confirming the plan as modified by this Opinion within five (5) business days.

An Order will follow.

Date:   September 6, 2006

_____
John J. Thomas, Bankruptcy Judge
(CMS)

*This opinion is electronically signed and filed on the same date.*

---

[11] Such sum can be modified as approved by the Court or as may be agreed between the purchaser, the Debtor, and particular claimants, also subject to Court approval.